UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

KATHRYN O'HAGAN,

                Plaintiff,

    - against -

MORGAN STANLEY DW INC.,

                Defendant.

--------------------------------------------------------x

06 CV 3523
(LAK)(THK)(ECF Case)

____ Civ. ____

COMPLAINT

PLAINTIFF DEMANDS
TRIAL BY JURY

RECEIVED
MAY 0 9 2006
U.S.D.C. S.D N.Y.
CASHIERS

Plaintiff Kathryn O'Hagan, by her attorneys, Liddle & Robinson, L.L.P., for her Complaint against Morgan Stanley DW Inc. (hereinafter "Morgan Stanley" or "Defendant") alleges as follows:

## THE PARTIES

1.     Plaintiff Kathryn O'Hagan resides at 10 East 85th Street, New York, New York 10028. Ms. O'Hagan worked for Morgan Stanley in New York, New York from February 5, 2001 until she resigned her employment on April 8, 2004 as a Financial Advisor ("FA") as a result of her constructive discharge. Ms. O'Hagan worked first out of Morgan Stanley's Two World Trade Center office. After September 11, 2001, when she escaped the 73rd floor of that building, she worked at Morgan Stanley's office at 2 Penn Plaza, and later relocated to 330 Madison Avenue ("Grand Central Branch").

2.     Defendant Morgan Stanley is a retail broker-dealer with over 500 branches. Morgan Stanley is a corporation with its principal executive offices located at 2000 Westchester Ave. LD, Purchase, NY 10577.

## THE NATURE OF THE ACTION

3.     This is a civil action for damages and remedies brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), the New York State Executive Law § 296 et seq. ("New York State Human Rights Law"); and the Administrative Code of the City of New York § 8-101 et seq. ("New York City Human Rights Law"); the Fair Labor Standards Act of 1938 § 6(d), as amended, 29 U.S.C. § 206(d) ("Equal Pay Act"); the New York State Labor Law §194(1) ("New York State Equal Pay Law"); as well as damages and remedies available under the common law.

## JURISDICTION & VENUE

4.     This Court has jurisdiction over this action under 28 U.S.C. § 1331.

5.     Ms. O'Hagan filed charges of sex discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") on November 4, 2004.

6.     The EEOC issued Ms. O'Hagan a Notice of Right to Sue on February 9, 2006.

7.     Ms. O'Hagan served copies of this Complaint upon the New York City Commission on Human Rights and the Corporation Counsel prior to filing it in this Court.

8.     Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to Plaintiff's claims occurred in the Southern District of New York.

FACTS

9.    Ms. O'Hagan joined Morgan Stanley on February 5, 2001 as an FA.  FAs are retail stock brokers.  Before joining Morgan Stanley, Ms. O'Hagan had worked as an English Professor and held other professional positions within the financial industry.

10.    Ms. O'Hagan began her employment with Morgan Stanley at the firm's Two World Trade Center branch, 73rd Floor.  After the World Trade Center was destroyed on September 11, 2001, Morgan Stanley relocated Ms. O'Hagan to the 2 Penn Plaza Branch.  Two weeks later, Ms. O'Hagan began working out of the firm's Grand Central Branch.

11.    When Ms. O'Hagan arrived at the Grand Central Branch, she noticed that it employed very few female FAs.  In fact, women composed less than 10% of the branch's FAs. Moreover, management was made up almost exclusively of men, with the one exception being a female compliance manager.  Men were in the top slots of management – Arun Sengupta was the Branch Manager, Chris O'Connor and then John Marchak was the Assistant Branch Manager, John Steigerwald was the Mutual Funds Coordinator, Frank Pezzello was the Operations Manager and Frank Chou was the Sales Manager.

12.    Shortly after she joined the Grand Central Branch, Morgan Stanley forcibly partnered Ms. O'Hagan up with a male FA, John Steigerwald.  Mr. Steigerwald was also in management as the Mutual Fund Coordinator.  Mr. Chou told Ms. O'Hagan that she should share her accounts with Mr. Steigerwald because she did a great deal of mutual fund business.

13.     From the onset of the relationship, Mr. Steigerwald began to sexually harass Ms. O'Hagan. For example, in October 2002, Mr. Steigerwald told Ms. O'Hagan that it was nice to work with a woman because he "loves pussy." He shared that he loved to "lick pussy more than anything in the world" and then asked Ms. O'Hagan: "Do you shave your pussy?" He then added that he "love[s] it when a bitch shaves her quim."

14.     Mr. Steigerwald also showed a discriminatory animus towards women customers. In October 2002, Mr. Steigerwald told Ms. O'Hagan that female clients "drive him crazy." Mr. Steigerwald told Ms. O'Hagan that she had a real talent for dealing with female clients and that she had an advantage with female customers since she was a woman. Mr. Steigerwald advised Ms. O'Hagan to "pitch the bitch" when working with a female customer.

15.     In October 2002, Ms. O'Hagan complained to Mr. Chou about Mr. Steigerwald's behavior. Ms. O'Hagan told Mr. Chou that she was uncomfortable working with Mr. Steigerwald. Ms. O'Hagan explained that she found him verbally offensive and gave examples of the sexually offensive remarks he had made.

16.     Rather than remedying the situation, Mr. Chou told Ms. O'Hagan that she should not make a big deal out of it because she works for a brokerage firm and that Mr. Steigerwald did a lot for Ms. O'Hagan as a manager.

17.     Subsequently, Mr. Steigerwald's sexually offensive behavior escalated through December 2002 and January 2003.

18. For example, Mr. Steigerwald would share that he was "so horny even the crack of dawn ain't safe" and that he "need[ed] to get some trim tonight," which was a sexual reference.

19. At this time, not long after she had complained to Mr. Chou, Ms. O'Hagan learned that 167 of her accounts had been removed from her FA number. This meant she could not access account information for trading or service her clients when they called. Ms. O'Hagan's inability to service her clients' needs hurt her reputation with clients, and her inability to trade directly affected her compensation.

20. There was no legitimate reason for her accounts being removed, and upon information and belief, Morgan Stanley removed them in retaliation to Ms. O'Hagan's complaints of sexual harassment.

21. The accounts had been transferred to two men – Mr. Steigerwald and FA Scott Harvey. On January 24, 2003, Ms. O'Hagan asked for and received a printout that showed all 167 accounts as being under Mr. Steigerwald's management.

22. Throughout January 2003, Ms. O'Hagan repeatedly asked Mr. Chou to return the 167 accounts to her management. While Ms. O'Hagan suffered thousands of dollars in lost revenue from the transfer, Mr. Chou represented to her that it was not a problem. When Ms. O'Hagan repeatedly requested meetings with Mr. Chou to discuss the issue, he responded as if she were an office rabble-rouser, asking: "O'Hagan, what trouble are you bothering me with now?"

23.     Ms. O'Hagan then turned to other outlets in the office, including Alana Albritton, the Branch Manager's Assistant; Shanon Solis, Mr. Steigerwald's Assistant; Janine Tortorelli, a Sales Assistant to Gene Chamlin, an FA; and to Frank Pezzelo, the Director of Operations.  Ms. O'Hagan received many responses, but no help.  For instance, Ms. O'Hagan's attempt at the resolving the issue met with comments such as:

- "You don't know how to operate your computer."
- "You don't know what you're talking about."
- "What is the big deal?"
- "Ask someone else."
- "I am not going back and forth with this."
- "I am under the impression someone else took care of this."
- "Talk to John [Steigerwald]."
- "Management took these accounts from you for a reason."
- "Stop causing problems and wasting everyone's time."

24.     Finally, in or around March 2003, Mr. Chou and Mr. Pezzello agreed to meet with Ms. O'Hagan to discuss her transferred accounts.  Instead of remedying the situation, however, Mr. Chou and Mr. Pezzello accused Ms. O'Hagan of making trouble in the office.

25.     After two months of getting nowhere going through the proper channels, Ms. O'Hagan told Mr. Chou that she was going to talk to his superior, Regional Director Bill McMahon, about the problem.  Mr. Chou then claimed there had been a mistake and returned some of Ms. O'Hagan's accounts to her.

26.    Mr. Steigerwald nevertheless often traded for Ms. O'Hagan's clients in his FA number, and thereby took commissions that should have been credited to Ms. O'Hagan.

27.    In early January 2003, Mr. Steigerwald began to physically sexually harass Ms. O'Hagan.  On January 2, he rubbed Ms. O'Hagan's buttocks with his hand while she was leaning over his computer.  When she told him to stop and never do that again, he began laughing hysterically.  Ms. O'Hagan left his office.

28.    After this incident, Ms. O'Hagan orally complained to two managers – Mr. Chou and Mr. Marchak.  Mr. Chou told Ms. O'Hagan that she worked in the brokerage industry and Mr. Steigerwald was her partner so they should work it out.  Mr. Chou said that he would speak to Mr. Steigerwald, but upon information and belief, he never did so.

29.    Mr. Steigerwald's physical sexual harassment continued through 2003.  On numerous occasions, he leaned up against Ms. O'Hagan's buttocks and breasts and rubbed her buttocks from behind, pretending that it was an accident when it was clearly deliberate.  Each time, Ms. O'Hagan asked him to stop and each time, he responded by laughing.

30.    On February 5, 2003, Mr. Steigerwald placed pornography on Ms. O'Hagan's desk for the first of what was to be many times. He left an issue of Forum, a magazine that contains sexually explicit letters from readers and erotic photographs. Mr. Steigerwald said that since Ms. O'Hagan's prior career was that of an English Professor, she should write erotic stories for Forum.

7

31.     At this time, Ms. O'Hagan again complained to Mr. Chou.  She told him that these materials made her highly uncomfortable and said that there was a great deal of inappropriate and unprofessional, offensive behavior in the office.  Ms. O'Hagan reported that there was a lot of pornography in the office and that Mr. Steigerwald often had FAs Charles Winitch, Neil Okun, and Joseph Lombardo in his office to watch pornography on his company computer.  Ms. O'Hagan reported a specific instance in which Mr. Steigerwald showed her and another FA Andoni Yultrade One Night In Paris – a nude pornographic sex video featuring Paris Hilton.  Rather than investigate the problem, Mr. Chou denied it, saying: "That is not true.  We have a very professional office and you should be happy for the opportunity work here."  Ms. O'Hagan has knowledge that Mr. Chou viewed this video as well and enjoyed Mr. Steigerwald's frequent pornographic office viewings.

32.     Just one day later, on February 6, 2003, Branch Manager Arun Sengupta sent out an e-mail with the FA Power Index spreadsheet for the office detailing the ranking purported used to determine which brokers will inherit accounts from departing brokers.  Inheriting accounts directly affects an FA's compensation.  Ms. O'Hagan's name was the only name omitted from the spreadsheet.  Upon information and belief, Ms. O'Hagan's name was excluded in retaliation for her complaints about sexual harassment.

33.     In general, Morgan Stanley favored male FAs over female FAs in the distribution of accounts.

34.     That day, Ms. O'Hagan e-mailed Mr. Sengupta about being omitted from the list and she asked Mr. Chou that her name be placed on the Power Index.  Ms. O'Hagan's requests were futile.  Her name was not placed on the list and management excluded Ms. O'Hagan from the list and subsequently from account distributions for months while other FAs were included.

35.    Ms. O'Hagan complained to Mr. Chou about being excluded from the Power Index. Mr. Chou told Ms. O'Hagan that she was always complaining and if she worked harder than all the men in the office, that she might inherit some large accounts. Ms. O'Hagan was the number one FA from her training class not only in the office, but nationally – having won the National Director's Award (the highest possible honor for Morgan Stanley brokers) for three years consecutively. Ms. O'Hagan reminded Mr. Chou of this and that she always worked until 9 p.m.

36.    On March 7, 2003, Mr. Steigerwald sent Ms. O'Hagan a sexually explicit e-mail via the Morgan Stanley e-mail system. Mr. Steigerwald described the video as "great," "sexy" and "hilarious" and suggested they watch it together. The video was an animated cartoon called "Clinton Fucker." In the video, a cartoon character of former President Clinton, with his penis exposed, chases six different women and has sexual intercourse with them, scoring points for his activity. Mr. Steigerwald told Ms. O'Hagan that he wished he could have sex with all the women in the office like the cartoon character.

37.    That same day, Ms. O'Hagan sent a letter to Mr. Chou complaining about the most recent pornographic e-mail she received from Mr. Steigerwald and asking to talk about it, and document the incident with Human Resources. Ms. O'Hagan reminded Mr. Chou that she has "brought Steigerwald's inappropriate sexual behavior in the office to [his] attention several times now."

38.    On March 18, 2003, Mr. Steigerwald sent Ms. O'Hagan a second sexually explicit e-mail. The e-mail contained a video entitled "What It Feels Like Owning Stocks in 2002." In the video, a woman repeatedly kicks a man who is lying on the floor in his genital area as he screams and grimaces in pain. When the e-mail opened on Ms. O'Hagan's desktop, it was in full

view of several other Morgan Stanley employees.  Mr. Steigerwald told Ms. O'Hagan that the woman in the video reminded him of her.  Like the March 7 e-mail, this e-mail was sent over the Morgan Stanley e-mail system.  Moreover, it was sent to at least eight male, Morgan Stanley employees.

39.     On March 18, 2003, Ms. O'Hagan sent another letter to Mr. Chou regarding Mr. Steigerwald's behavior.  In the letter, Ms. O'Hagan asked Mr. Chou if he had spoken to Mr. Steigerwald and she reported that she received another e-mail that was "really disgusting."  Ms. O'Hagan wrote to Mr. Chou that she did not "want to receive these offensive, sexual e-mails – and it's being sent around the office."

40.     Sending sexually explicit e-mails over the firm's e-mail system is against the stated policies of Morgan Stanley regarding sexual harassment.  However, it seems that in the Grand Central Office, pornographic emails were regularly distributed among male brokers and even male members of management.

41.     On June 19, 2003, Mr. Steigerwald illegally accessed Ms. O'Hagan's entire client database and use confidential client information without her permission to solicit charity donations to an event in which he was involved called the Ironman Triathlon.  Clients were extremely upset that their personal contact information was being used for solicitations, and Ms. O'Hagan lost twenty accounts as a result, which meant significant lost revenues.  One client, Rachel Pine, was so angry that she spoke to both Mr. Chou and Mr. Segupta, who dismissed her complaint and did nothing to remedy the situation.

42.     From June 2003 to March 2004, on several occasions Mr. Steigerwald invited Ms. O'Hagan to his office on the premise of doing business.  Once Ms. O'Hagan arrived, however, Mr. Steigerwald would show her pornographic sex videos on his computer that his best friend Gary Rodbell had sent him.  The videos were very graphic and contained things such as group sex, bestiality, oral sex, anal sex, and more.  One of them involved a highly revolting sex act in which a woman swallows almost a gallon of a man's ejaculation and allows it to drip down her face, amid an extremely graphic soundtrack.

43.     Mr. Steigerwald said that he had shown several men in the office the pornographic videos, including but not limited to Charles Winitch, Joseph Lombardo, and Neil Okun, and that they loved them.  He said Ms. O'Hagan was the only woman he invited to watch.  Upon information and belief, Mr. Steigerwald invited Morgan Stanley employees into his office to view pornography on a daily basis.

44.     On July 10, 2003, Mr. Steigerwald placed a graphic, pornographic picture on Ms. O'Hagan's desk depicting a man and two women nude engaged in sexual activity.  Mr. Steigerwald then grabbed himself in the genital area and asked Ms. O'Hagan: "Do you know how I have a big cock?"  He then simulated adding numbers on Ms. O'Hagan's calculator and continued: "My cock is about seven inches normally, and then when I see a pretty girl it is about nine inches. My unit gets huge."

45.     On November 6, 2003, Mr. Steigerwald placed a copy of <u>Penthouse Letters</u> magazine on Ms. O'Hagan's desk and suggested that Ms. O'Hagan send some erotic stories to it, again citing her background as an English Professor.

46.     In November 2003 and also in March 2004, Ms. O'Hagan complained to Mr. Chou and another manager John Marchack several times about Mr. Steigerwald's lewd behavior and the pornography he placed on her desk.  When Ms O'Hagan complained, Mr. Chou and Mr. Marchack questioned her as to why she was complaining again and sent her away saying that they would make a note of it and look into the situation.  Ms. O'Hagan complained repeatedly because Morgan Stanley management never resolved Ms. O'Hagan's problems and never got back to her about performing any type of investigation.

47.     Mr. Chou regularly ignored Ms. O'Hagan and deleted her e-mails without reading them.  For example, on March 1, 2004, Ms. O'Hagan received a receipt in her e-mail that said he had deleted an e-mail she sent him without reading it.

48.     In or around March 2004, Ms. O'Hagan began inquiring of Mr. Chou about moving out of a cubicle and getting her own office, in part, to escape from John Steigerwald's sexual overtures.  Ms. O'Hagan's production had reached over $274,000.  The production to merit a new office was $250,000.  When Ms. O'Hagan first asked Mr. Chou about moving into her earned office, he told her that an office would be available soon.  At this time, at least nine offices were empty.  When Ms. O'Hagan again inquired, Mr. Chou raised the production minimum by $50,000, to $300,000.  However, FAs with lower production than Ms. O'Hagan resided in offices.  Upon information and belief, Morgan Stanley management refused to give Ms. O'Hagan an office in retaliation for her complaining about sexual harassment.

49.     Throughout her employment, Ms. O'Hagan was denied a registered, competent, consistent sales assistant, which is essential to an FA's success.  Morgan Stanley

changed Ms. O'Hagan's assistants regularly and never assigned her a registered assistant. Morgan Stanley generally provided male FAs with competent, steady sales assistant support.

50.     On March 8, 2004, Mr. Sengupta distributed a memorandum around the office of Gross-to-Date standings that listed the top four FAs. Ms. O'Hagan's rank was number one and over thirty percent higher than the person ranked number two. Ms. O'Hagan was the only female on the list and, despite being ranked the highest, was the only FA on the list that Morgan Stanley had failed to promote to the position of coordinator or manager.

51.     On March 30, 2004, Mr. Steigerwald placed another extremely graphic pornographic picture on Ms. O'Hagan's desk. He said to Ms. O'Hagan: "Can I wring out your panties? I bet you're really wet right now. Is the crotch of your panties red and green and crusty? Can I sniff them? If you were alone in my house and no one was home with you, and you could not get caught, and you found a pair of my boxer shorts behind the sofa, would you sniff them?

52.     On April 1, 2004, Assistant Branch Manager John Marchak sent an offensive joke e-mail to the entire office that outraged many Italian-Americans. The e-mail was flagged "high importance" and purported to be announcing a new mutual fund "MOB*X" that specialized in mob-related activities. It was cc'd to mutual fund management.

53.     On April 7, 2004, Mr. Steigerwald placed another pornographic picture on Ms. O'Hagan's desk and asked her: "Do you ever shave your pussy? I love it when a woman does this – it tastes so good – I just love to eat pussy. When a woman shaves her pussy, it says she is really taking good care of her man."

54.    On April 8, 2004, Ms. O'Hagan resigned from Morgan Stanley to go to another brokerage house. Her resignation was a constructive discharge due to the gender discrimination, sexual harassment, retaliation, and promotion discrimination she had endured at Morgan Stanley.

55.    On the day Ms. O'Hagan resigned, Mr. Steigerwald began contacting all of her clients. Mr. Steigerwald lied to Ms. O'Hagan's clients, telling them a variety of untruths such as that Morgan Stanley had fired Ms. O'Hagan, that she had regulatory problems, that she was recently licensed and did not know what she was doing, that she left in the middle of the night, and that she was inexperienced, that she was really an English Professor and not a broker at all, and that she lacked the knowledge to manage money. Mr. Steigerwald told Ms. O'Hagan's clients that Morgan Stanley had appointed him as the new point person for all of her accounts.

56.    As a result of Mr. Steigerwald's false representations to her clients, Ms. O'Hagan lost millions of dollars in client accounts, and her reputation was severely damaged.

57.    On May 4, 2004, Ms. O'Hagan received a facsimile from one of her clients, Christina Manca, of a copy of a letter Ms. Manca sent to Morgan Stanley complaining about Frank Chou. In the letter, Ms. Manca explained that she called Mr. Chou regarding an address change error that had occurred in her account after Ms. O'Hagan resigned. Mr. Chou responded to Ms. Manca by advising her to "have [Ms. O'Hagan] arrested."

58.    On July 12, 2004, Ms. O'Hagan received an e-mail from her client E. Sue Elliott. She wrote that Mr. Steigerwald had called her when Ms. O'Hagan left Morgan Stanley and

told her that Ms. O'Hagan just walked out, was in over her head, had taken on too many clients, and had burned out and left the industry.

59.     Ms. O'Hagan was not the only female employee subjected to discrimination and sexual harassment while working as FAs at Morgan Stanley.  Carol Chiarello, Chana Schwartz, Rani Lau, Dana Vernon, Sheila Jamison, Ellen Baker, Audrey Luo, and Alice Bolocan experienced similar instances of sexual harassment and sexual discrimination.  Many witnessed the pornography and sexually charged atmosphere in the Grand Central office.  All were regularly denied account distributions and witnessed males receiving assets over females.

### FIRST CAUSE OF ACTION

(Sex Discrimination and Sexual Harassment under Title VII)

60.     Plaintiff repeats and reallege the allegations contained in paragraphs 1 through 59 as if separately set forth herein.

61.     At all relevant times, Plaintiff was an "employee" of Defendant under Title VII, 42 U.S.C. § 2000e(f).

62.     Upon information and belief, Defendant is an "employer" under Title VII, 42 U.S.C. § 2000e(b).

63.     Defendant discriminated against Ms. O'Hagan because of her sex in violation of Title VII, 42 U.S.C. § 2000e-2(a), by the conduct described in this complaint, including but not limited to sexual harassment, discrimination in account distributions and therefore pay, failure to promote, constructive discharge, and retaliation.

15

64.     As a result of Defendant's discrimination, Ms. O'Hagan has suffered substantial damages, including lost wages and benefits and emotional distress, in an amount to be determined at trial.

65.     Upon information and belief, Defendant's discriminatory conduct was engaged in with malice and/or reckless indifference to Ms. O'Hagan's federally protected rights. Ms. O'Hagan is therefore entitled to punitive damages under Title VII.

## SECOND CAUSE OF ACTION

(Sex Discrimination and Sexual Harassment Under
the New York State Human Rights Law)

66.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 65 as if separately set forth herein.

67.     At all relevant times, Plaintiff was an "employee" of Defendant for purposes of §§ 292 and 296 of the New York State Human Rights Law.

68.     On information and belief, Defendant is an "employer" for purposes of §§ 292 and 296 of the New York State Human Rights Law.

69.     Defendant discriminated against Ms. O'Hagan because of her sex in violation of § 296 of the New York State Human Rights Law by the conduct described in this complaint.

70.     As a result of Defendant's discrimination, Plaintiff has suffered substantial damages, including but not limited to mental distress and lost wages and benefits, in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

(Gender Discrimination and Sexual Harassment Under
the New York City Human Rights Law)

71.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 70 as if separately set forth herein.

72.     Plaintiff is a "person" under § 8-102(1) of the New York City Human Rights Law.

73.     On information and belief, Defendant is an "employer" subject to the provisions of the New York City Human Rights Law under § 8-102(5) of the Administrative Code.

74.     Defendant discriminated against Ms. O'Hagan because of her gender in violation of § 8-107 of the New York City Human Rights Law, by the conduct described in this complaint.

75.     As a result of Defendant's discrimination, Plaintiff has suffered substantial damages, including but not limited to mental distress and lost wages and benefits, in an amount to be determined at trial.

76.     Upon information and belief, Defendant's discriminatory actions against Plaintiff were taken with reckless indifference to Plaintiff's rights, entitling her to punitive damages under the New York City Human Rights Law.

## FOURTH CAUSE OF ACTION

### (Retaliation Under Title VII)

77.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 76 as if separately set forth herein.

78.     Ms. O'Hagan opposed Defendant's unlawful, discriminatory employment practices and engaged in protected activity under Title VII by repeatedly complaining to management about sexual harassment and gender discrimination.

79.     Defendant retaliated against Ms. O'Hagan for having engaged in the protected activity described in the preceding paragraph by, inter alia, (a) removing her accounts from her, (b) removing her name from the Power Index, and (c) increasing their harassment.

80.     Defendant's actions constitute discrimination and retaliation against Plaintiff in violation of Title VII, 42 U.S.C. § 2000e-3.

81.     As a result of Defendant's retaliation, Ms. O'Hagan has suffered substantial damages, including lost wages and benefits and emotional distress, in an amount to be determined at trial.

82.    Upon information and belief, Defendant's retaliation was engaged in with malice and/or reckless indifference to Ms. O'Hagan's federally protected rights. Ms. O'Hagan is therefore entitled to punitive damages under Title VII.

## FIFTH CAUSE OF ACTION

(Retaliation Under the New York State Human Rights Law)

83.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 82 as if separately set forth herein.

84.    Ms. O'Hagan opposed Defendant's unlawful, discriminatory employment practices and engaged in protected activity under the New York State Human Rights Law by repeatedly complaining to management about sexual harassment and gender discrimination.

85.    Defendant retaliated against Ms. O'Hagan for having engaged in the protected activity described in the preceding paragraph by, inter alia, (a) removing her accounts from her, (b) removing her name from the Power Index, and (c) increasing their harassment.

86.    Defendant's actions constitute discrimination and retaliation against Plaintiff in violation of the New York State Human Rights Law, § 296.

87.    As a result of Defendant's retaliation, Plaintiff has suffered substantial damages, including but not limited to mental distress and lost wages and benefits, in an amount to be determined at trial.

<u>SIXTH CAUSE OF ACTION</u>

(Retaliation Under the New York City Human Rights Law)

88.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 87 as if separately set forth herein.

89.     Ms. O'Hagan opposed Defendant's unlawful, discriminatory employment practices and engaged in protected activity under the New York City Human Rights Law by repeatedly complaining to management about sexual harassment and gender discrimination.

90.     Defendant retaliated against Ms. O'Hagan for having engaged in the protected activity described in the preceding paragraph by, <u>inter alia</u>, (a) removing her accounts from her, (b) removing her name from the Power Index, and (c) increasing their harassment.

91.     Defendant's actions constitute discrimination and retaliation against Plaintiff in violation of the New York City Human Rights Law, § 8-107.

92.     As a result of Defendant's retaliation, Plaintiff has suffered substantial damages, including but not limited to mental distress and lost wages and benefits, in an amount to be determined at trial.

93.     Upon information and belief, Defendant's retaliatory actions against Plaintiff were taken with reckless indifference to Plaintiff's rights, entitling her to punitive damages under the New York City Human Rights Law.

## SEVENTH CAUSE OF ACTION

(Sex Discrimination Arising Under

the federal Equal Pay Act)

94.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 93 as if separately set forth herein.

95.     At all relevant times Plaintiff was an "employee" of Defendant for purposes of § 203(e) of The Fair Labor Standards Act.

96.     Upon information and belief, Defendant is an "employer" for purposes of § 203(d) of the Fair Labor Standards Act.

97.     Upon information and belief, Defendant discriminated against Plaintiff because of her sex in violation of § 296 of The Equal Pay Act by paying Plaintiff lower compensation than males in substantially similar positions, including but not limited to by discriminating in account distributions.

98.     As a result of Defendant's discrimination, Plaintiff suffered substantial damages, including lost wages and benefits, in an amount to be determined at trial.

EIGHTH CAUSE OF ACTION

(Sex Discrimination Arising Under

the New York State Equal Pay Law)

99.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 98 as if separately set forth herein.

100.    At all relevant times, Plaintiff was an "employee" of Defendant for purposes of the New York State Equal Pay Law under the New York Labor Law §§ 190(2) and 194.

101.    Upon information and belief, Defendant is an "employer" for purposes of the New York State Equal Pay Law under New York Labor Law §§ 190(3) and 194.

102.    Defendant discriminated against Plaintiff because of her sex in violation of § 194 of the New York State Equal Pay Law by paying Plaintiff lower compensation than males in substantially similar positions, including but not limited to by discriminating in account distributions.

103.    As a result of Defendant's discrimination, Plaintiff has suffered substantial damages, including, but not limited to, lost wages and benefits, in an amount to be determined at trial.

104.    Upon information and belief, Defendant's discriminatory actions against Plaintiff was willful and in bad faith.  Plaintiff is therefore entitled to liquidated damages under the New York State Equal Pay Law.

NINTH CAUSE OF ACTION

(Tortious Interference with Prospective Economic Advantage)

105.   Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 104 as if separately set forth herein.

106.   Plaintiff had economic relationships with her clients that contained the probability of future economic benefit.

107.   Defendant knew of the existence of the relationships.

108.   Defendant intentionally acted to disrupt the relationships by, inter alia, Mr. Steigerwald's calling Plaintiff's clients and making harmful misrepresentations about her.

109.   Plaintiff's relationships with her clients were disrupted by Defendant's acts.

110.   Defendant's acts proximately caused damages to Plaintiff.

WHEREFORE, while reserving the right to seek additional damages as available, Plaintiff demands judgment against Defendant as follows:

A.   On the First Cause of Action, back pay and benefits and front pay and benefits, plus compensatory and punitive damages, attorneys' fees, costs and interest, all in amounts to be determined at trial;

B.      On the Second Cause of Action, back pay and benefits and front pay and benefits, plus compensatory damages, costs and interest, all in amounts to be determined at trial;

C.      On the Third Cause of Action, back pay and benefits and front pay and benefits, plus compensatory and punitive damages, attorneys' fees, costs and interest, all in amounts to be determined at trial;

D.      On the Fourth Cause of Action, back pay and benefits and front pay and benefits, plus compensatory and punitive damages, attorneys' fees, costs and interest, all in amounts to be determined at trial;

E.      On the Fifth Cause of Action, back pay and benefits and front pay and benefits, plus compensatory damages, costs and interest, all in amounts to be determined at trial;

F.      On the Sixth Cause of Action, back pay and benefits and front pay and benefits, plus compensatory and punitive damages, attorneys' fees, costs and interest, all in amounts to be determined at trial;

G.      On the Seventh Cause of Action, back pay and benefits and front pay and benefits, liquidated damages, compensatory damages, costs and interest, all in amounts to be determined at trial;

H.      On the Eighth Cause of Action, back pay and benefits and front pay and benefits, liquidated damages, compensatory damages, attorneys' fees, interest and cost, all in amounts to be determined at trial;

I.   On the Ninth Cause of Action, compensatory damages in an amount to be determined at trial;

J.   Such other and further relief as this Court deems just and proper.

Dated:   New York, New York
         May 9, 2006

                         LIDDLE & ROBINSON, L.L.P.

                         By: _____
                             Michael E. Grenert (MG 2021)
                         Attorneys for Plaintiff
                         800 Third Avenue
                         New York, New York 10022
                         (212) 687-8500